2024 IL App (1st) 230172-U

FIRST DIVISION
November 25, 2024

No. 1-23-0172

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court |
| | ) | of Cook County. |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 99 CR 0646301 |
| | ) | |
| ANTOINE JOHNSON, | ) | |
| | ) | The Honorable |
| Defendant-Appellant. | ) | James Linn, |
| | ) | Judge Presiding. |

_____

PRESIDING JUSTICE FITZGERALD SMITH delivered the judgment of the court.
Justice Lavin concurred in the judgment.
Justice Pucinski dissented.

**ORDER**

¶ 1    *Held:* We affirm the trial court's denial of postconviction relief following a third-stage evidentiary hearing. The trial court did not commit manifest error in concluding that defendant failed to establish either his claim of ineffective assistance of trial counsel or his claim of actual innocence.

¶ 2    Defendant-appellant Antoine Johnson (Johnson) appeals from the denial of

postconviction relief following a third-stage evidentiary hearing at which the trial court rejected

his claims of ineffective assistance of trial counsel and actual innocence. For the following reasons, we affirm.

¶ 3                                    BACKGROUND

¶ 4        This cause arises from a gang-related shooting that took place on August 28, 1998, which resulted in the death of Patricia Bowers and injuries to Larrail Wright, Mahdi Riley, and Mikki West. Defendant was 16 years old at the time of the incident. Defendant and a codefendant, Robert Branch (codefendant), were charged with multiple counts of first degree murder, attempt first degree murder, aggravated battery with a firearm, aggravated discharge of a firearm, and aggravated battery.[1] Before defendant's trial, his trial counsel filed motions to quash his arrest and suppress evidence, including his statements to police. The motions were denied.

¶ 5        At defendant's trial, both Wright and Riley identified defendant, a rival gang member, as being involved in the shooting.

¶ 6        Wright testified that around 11:00 p.m. on the date of the shooting, he was with Riley, "Smurf," and "Poppie" in front of a liquor store near 1469 East 67th Street, along with several other people. Wright heard gunshots coming from across the street, after which he felt a gunshot in his back. Wright turned and saw "Big Mac,"[2] whom he identified as defendant, as well as "Pumpkin," whom he identified as codefendant Branch, and "Quick" shooting toward the crowd in front of the liquor store. Wright went to a hospital where he was treated for a bullet wound in his jaw. Wright testified that, while in the hospital, he told Chicago police detective Raymond Binkowski that defendant, codefendant, and "Quick" were the shooters. On August 31, 1998, Wright identified defendant in a lineup as being "from the shooting." Wright further testified that

---

[1] Defendant and codefendant Branch were tried separately. Defendant elected a jury trial, while codefendant elected a bench trial.

[2] Defendant is referred to in the record as both "Big Mac" and "Big Mack."

he had known defendant for about four or five months before the shooting and that he and defendant were in different factions of a gang.

¶ 7        Similarly, Riley testified that at the time of the shooting, he was in front of the liquor store with Wright, as well as Ramell Bowman and Douglas Williams; all these men were members of the same gang. Riley recalled that one of the men said, "there they go," and Riley looked up and saw "Big Mack" (defendant) and "Pumpkin" (codefendant Branch) standing on the corner and pointing guns toward the crowd in front of the liquor store. As Riley rode away on his bicycle, he was shot in the back. He jumped off his bike and ran into a nearby home. He heard about 20 to 30 gunshots. Riley further testified that he had known defendant for about four or five years before the shooting. While in the hospital, Riley identified defendant in photographs as being from the shooting. Riley subsequently identified a photograph of codefendant and identified "Quick" in a lineup.

¶ 8        Mikki West testified that she was with decedent Bowers in front of the liquor store when she heard gunshots coming from across the street. She then saw that Bowers had "holes in her neck" and saw Bowers fall to the ground. West was shot in the leg.

¶ 9        Chicago police detective Ted Przepiora testified that on August 31, 1998, Wright identified defendant in a lineup as one of the shooters. On October 12, 1998, Riley also identified codefendant from a photo array as one of the shooters. In February 1999, Wright and Riley separately identified codefendant in a lineup as one of the shooters.

¶ 10       Assistant State's Attorney (ASA) Geraldine D'Souza testified that on August 31, 1998, she spoke with defendant in the presence of detective Przepriora and a youth officer. Defendant was 16 years old at the time. ASA D'Souza testified that defendant agreed to speak after she advised him of his *Miranda* rights. Defendant told ASA D'Souza that he was near 1469 East

67th Street at the time of the shooting. He recalled that "Quick" and codefendant Branch pulled out .38-caliber guns and started shooting at a crowd across the street. He stated that two factions of the Gangster Disciples gang had been fighting in a "war." Defendant told ASA D'Souza that he was scared and felt in danger. He ran around the corner and through an alley and then came out behind "Quick" and codefendant. He told ASA D'Souza that he then pulled a .38-caliber weapon from his waistband and started shooting in the same direction as they had been shooting. Defendant admitted that he fired four shots and ran, and that he later disposed of the gun.[3]

¶ 11        Forensic investigator Joseph Bembyn testified that he recovered 9-millimeter casings in three locations at the scene of the shooting, in groups of six, seven, and eight.

¶ 12        In his defense, defendant called detective Binkowski, who had interviewed Wright at the hospital on August 29, 1998, while Wright was being treated for the gunshot wound to his jaw. Detective Binkowski testified that Wright was difficult to understand because of his injury. He believed Wright to have said that he did not see "Big Mack" (defendant) at the shooting.

¶ 13        In rebuttal, detective Przepiora testified that he interviewed Wright a couple days later, on August 31, 1998, at which time Wright identified "Big Mack" (defendant), codefendant, and "Quick" as shooters. According to detective Przepiora, Wright said he had told detective Binkowski at the hospital that "Big Mack" (defendant) was, indeed, one of the shooters.

¶ 14        The jury found defendant guilty of first degree murder and three counts of aggravated battery with a firearm. He was sentenced to 30 years in prison for first degree murder and concurrent 10-year sentences for each aggravated battery count. The court subsequently reduced the first degree murder sentence to 28 years' imprisonment.

---

[3] Defendant's statement to ASA D'Souza was not reduced to writing.

¶ 15    On direct appeal, defendant argued, *inter alia*, that the trial court erred when it denied his motion to suppress. This Court affirmed, finding that defendant had given his statement voluntarily. See *People v. Johnson*, No. 1-00-3913 (2003) (unpublished order under Illinois Supreme Court Rule 23).

¶ 16    In 2003, defendant filed an initial postconviction petition, which was dismissed by the trial court upon the State's motion. In 2007, defendant filed a "supplemental petition," after which the trial court granted the State's motion to dismiss. Defendant appealed, but this Court subsequently granted his motion to voluntarily dismiss that appeal.

¶ 17    In 2011, defendant filed a *pro se* motion for leave to file a successive postconviction petition, asserting actual innocence based on newly discovered evidence. He attached affidavits from Terrence Hilliard and Jason Nichols. The circuit court docketed the petition and appointed the Cook County Public Defender's Office to represent defendant. In January 2012, appointed counsel filed a motion to withdraw pursuant to *People v. Greer*, 212 Ill. 2d 192 (2004), asserting that no useful testimony would come from Hilliard and Nichols. The trial court permitted counsel to withdraw but allowed defendant to file additional pleadings *pro se* or with hired counsel. Accordingly, in March 2013, defendant filed a *pro se* amended petition that attached the same affidavits from Hilliard and Nichols. The same postconviction counsel who had filed the *Greer* motion in the 2011 petition was assigned to represent defendant in the 2013 petition. Defendant filed a "Motion to Appoint Different Counsel" in July 2013; however, the record does not show that the trial court issued a ruling on that motion.

¶ 18    In April 2015, defendant, through postconviction counsel, filed an amended successive postconviction petition asserting a free-standing claim of actual innocence and ineffective assistance of counsel based on trial counsel's alleged failure to investigate Douglas Williams as a

witness. Defendant attached a notarized affidavit signed by Williams in which Williams attested that he was present at the scene during the shooting and that defendant was not one of the shooters. Williams averred that he came forward in early 2014, after he learned that defendant had been convicted of murder. Defendant also attached his own affidavit in which he averred that he had asked his trial counsel to send an investigator to the scene of the shooting to find witnesses, but counsel did not do so. Defendant attested that Williams frequented the corner of 67th and Blackstone and could easily have been found.

¶ 19    Upon the State's filing of a motion to dismiss, the trial court gave defendant's postconviction counsel time to contact trial counsel to supplement the petition. In October 2015, defendant supplemented the petition with an affidavit from his trial counsel, Kathryn Lisco. Lisco stated she could not recall sending an investigator to search the area of the shooting for witnesses and she did not send investigators to search for Williams in particular.

¶ 20    Following a hearing on the amended petition, the trial court granted the State's motion to dismiss.

¶ 21    Defendant appealed, arguing he had made a substantial showing that trial counsel was ineffective for failing to investigate or present Williams as a witness. Although defendant alleged a claim of actual innocence in his amended successive postconviction petition, he did not argue that issue.

¶ 22    In July 2019, this Court reversed the dismissal and remanded the matter for an evidentiary hearing. *People v. Johnson*, 2019 IL App (1st) 153204 (Mason, J., dissenting). In so doing, the majority decision concluded that defendant had made a substantial showing that trial counsel was deficient for not investigating or presenting Williams as a witness. Noting that it was required to take defendant's allegations as true at the second stage of the postconviction

process, it deduced that Williams' statements that defendant was not a shooter were exculpatory and corroborated defendant's theory that he was misidentified and that the State's identification witnesses (Wright and Riley) were not credible. *Id*. ¶ 45. The majority further noted that the record did not show a strategic reason for trial counsel's decision not to investigate or present Williams as a witness. *Id*. ¶ 46. Thus, it found that defendant had made a substantial showing he was prejudiced and, accordingly, it reversed and remanded for third-stage proceedings. *Id*. ¶¶ 49, 53.

¶ 23        On remand, the trial court conducted an evidentiary hearing in October 2022, at which it heard testimony from defendant, Williams, and defendant's trial counsel, Lisco.

¶ 24        During his testimony, defendant denied any involvement in the shooting. He explained that in the summer of 1998, he was 16 years old and known as "Big Mac." He was a member of the "Maul" faction of the Gangster Disciples, which at that time were rivals of the "Murder Town" faction of that gang. Members of the Maul faction frequented the area of 68th Street and East End, whereas the Murder Town faction frequented the area of 67th and Blackstone. He testified that he was not in the area when the shooting occurred and he did not know who was at the scene. Defendant recalled that he told his trial counsel, Lisco, that "67th and Blackstone is the center of the guys from Murder Town world." He told her that she "should send an investigator to the corner to try to talk to some people," as it was likely that she would find someone who was there on the night of the shooting. To defendant's knowledge, Lisco did not investigate as he suggested.

¶ 25        Defendant further testified that Douglas Williams was known as "Smurf" and was a member of the rival Murder Town faction. In 1998, defendant knew there was a Murder Town member called "Smurf," but he did not know Williams personally and did not speak with him

before trial. Defendant averred that in May or June 2014, he was introduced to Williams while they were incarcerated at the same prison. At some point, they talked about defendant's case. Williams told defendant that he was present during the shooting and knew defendant was not one of the shooters. Defendant asked Williams if he would execute an affidavit, and Williams said he would think about it. The Public Defender's office eventually procured an affidavit from Williams.

¶ 26    In response to questions about Terrence Hilliard, defendant stated he went to school with Hilliard, who was in the Murder Town faction. Defendant testified that he spoke with Hilliard in 2009, when they were both incarcerated.  Defendant averred that Hilliard said he knew that defendant was not involved in the shooting. He further stated that Hilliard was now deceased.

¶ 27    On cross-examination, defendant acknowledged that when he asked Lisco to send someone to 67th and Blackstone to investigate, he did not mention the names of any specific persons for her to locate.

¶ 28    Following his examination, the trial court asked defendant a number of questions. In response to these, defendant stated that he had been arrested about three days after the shooting. When the trial court asked if he told the State's Attorney or the police that he was there at the scene but shooting in self-defense, defendant said, "They pressured me in a way to say that," but maintained he was not at the shooting. Defendant said they "kept rereading me a story and feeding me a story about it," and he eventually went along with it because he was frightened.

¶ 29    Williams testified that he was currently incarcerated and serving a sentence for first degree murder. He acknowledged he was known as "Smurf," and that in 1998, he lived near the intersection of 67th Street and Blackstone and was in the Murder Town faction of the Gangster Disciples, which was at "war" with the Maul faction. Williams stated that "[a] disagreement

happened and [there were] shootings back and forth" between the two factions at that time. Williams averred that on the evening in question, he was in front of the liquor store with Riley and Wright, who were also members of the Murder Town faction. Just before the shooting, Williams saw three men approaching and yelled out, "here come those n***s," referring to "the other side, the Maul [faction]." He recognized one of the three men as "Quick," whom he knew to be "one of [the Maul's] main shooters." Williams knew that "Quick" was involved in prior shootings, including an incident where Williams' sister was shot.

¶ 30      Williams recalled that the area was well lit, that he clearly saw "Quick's" face, and that he had a "very good look" at the other two shooters. Williams had seen those two men before and knew them to be from the Maul faction, although he did not know their names. Even though his friends Riley and Wright were shot during the incident, when asked why he did not go to police to tell them what he saw, Williams answered "[b]ecause I'm black" and "[p]olice don't help. They make things worse." He also stated that in August 1998, he knew defendant as "Big Mac" and knew that he was in the Maul faction; however, he did not recall seeing defendant on the night of the shooting.

¶ 31      Williams further testified that in 2013, he was introduced to defendant in the yard at the Menard Correctional Center, where they overlapped for about a month. Williams recounted one of their conversations wherein defendant "informed [Williams] that somebody said that I was out there" the night of the shooting. According to Williams, defendant had not known that Williams was the person known as "Smurf," and Williams confirmed to defendant that he was the same individual. Williams also told defendant that he had witnessed the shooting, and that "Quick" and two other men were the shooters. After Williams learned defendant was incarcerated for the

murder, he agreed to sign an affidavit stating that defendant was not one of the shooters.[4] He said he agreed to testify because, "since I changed my life and became a God fearing man[,] I feel like that it's the right thing to do," and that he did not want someone to be in prison for "something that they didn't do." Williams denied that the police or anyone representing defendant had contacted him about the shooting in 1998, 1999, or 2000. When asked if the war between the Maul and Murder Town factions came to an end, Williams stated it had and that this had happened in "[p]robably 2001."

¶ 32        On cross-examination, Williams was asked why he did not stay for police to arrive after the shooting. He reiterated: "Because I'm black and I don't trust the police." Williams elsewhere explained that although Riley was his best friend and he knew he had been shot, there was "no way we would talk to [*sic*] about calling the police or helping the police. We would retaliate ourselves. We're a gang at that time" that was at war with defendant's faction.

¶ 33        Defendant also called Lisco, his trial counsel. Lisco testified she had some, but "not very much," independent recollection of representing defendant. In preparation for her testimony, she had reviewed "things that [she] had filed as well as portions of the trial record." Lisco averred that several efforts to locate her full "trial file" for defendant's case were unsuccessful. That file would have included her notes from interviews and her "investigations." Lisco could not recall specifically whether she sent an investigator to the area of 67th and Blackstone in connection with defendant's trial. However, she believed that an investigator had photographed the scene, because "there was a daytime picture admitted in the trial which [she] expect[ed] was taken by [her] investigator and [her]." She could not recall whether she or an investigator spoke to anyone

---

[4] According to Williams' affidavit in support of defendant's amended postconviction petition, it was "early 2014" when he discovered that defendant was convicted in connection with the August 1998 shooting and offered to assist him.

from that area. She did not recall speaking to anyone who witnessed the shooting before defendant's trial or speaking with Williams in particular.

¶ 34    On cross-examination, Lisco stated she did not specifically remember if defendant told her to look for possible witnesses at 67th Street and Blackstone. However, she said that "it could have happened." Lisco acknowledged that Williams was mentioned by Riley in his trial testimony. She did not remember whether defendant mentioned Williams to her after Riley's testimony, during the remainder of trial, or thereafter. Lisco stated that she recently reviewed Riley's testimony and did not think it would have prompted her to conduct further investigation. Lisco explained that this was because "all [Riley] did was mention that he was standing with Douglas Williams, nothing about anything that would trigger my belief that [Williams] would be an exonerating witness or helpful witness." Elsewhere on cross-examination, Lisco agreed that a pretrial discovery response filed in January 2000 listed John Jenkins, one of her investigators, as a potential witness[5] and, in a subsequent filing from September 2000, she had listed additional investigators as potential witnesses.

¶ 35    After Lisco's testimony, defendant's counsel informed the court that defendant wished to assert an actual innocence claim in addition to his claim of ineffective assistance of trial counsel. The State objected, arguing that the appellate court's remand was for an evidentiary hearing on ineffectiveness of trial counsel, and "we are only to deal with what's in the four corners of the remand." Over the State's objection, the court indicated it would consider the actual innocence claim because "it's all part of the same case," and the same evidence was the basis for both claims. The court noted it did not want "someone else having to hear this all over again" on a

_____

[5] She noted that Jenkins was now deceased.

subsequent collateral proceeding. The court thus determined that it would address both actual innocence and ineffective assistance.

¶ 36    At the end of the proceeding, the court entered into evidence certified copies of conviction for Williams for first degree murder and manufacturing narcotics.

¶ 37    In closing argument, defendant's counsel argued that the evidence demonstrated defendant was "actually innocent" and had received ineffective assistance of trial counsel. He characterized the case as always having been "closely balanced," as the trial evidence consisted of an unwritten statement coerced from defendant when he was 16 years old and "eyewitness identifications from members of an opposing gang." With the new testimony from Williams, defendant, and Lisco, counsel urged that "things are different now in term of how closely balanced the case is." Counsel further argued that defendant had been "intentionally framed" by Riley and other witnesses "to get back at the Maul [faction] for this shooting," and that Riley had "engineered this false identification to take as many members of the Maul off the street that he could."

¶ 38    At the close of the proceeding, the trial court ruled that defendant was not entitled to relief under either his claim of ineffective assistance of trial counsel or his claim of actual innocence. First, with respect to ineffective assistance, the trial court indicated its belief that Lisco could not be faulted for failing to send an investigator to the crime scene to discover unnamed potential witnesses. As the court explained,

> "[Defendant] says if you just would have sent an investigator to
> talk to people on the corner, we would have found somebody that may
> have known something.
>
> I have never heard of an investigation – a criminal defense

12

investigation * * * where you go out days later and canvass a street corner * * *, not knock on doors on brick and mortar buildings, not talk to specific people, employees of businesses, but just to try to engage with people that happen to be on a street corner at a particular time to think that you're going to find somebody that's going to be willing to talk to you, No. 1, and be willing to talk to you about some homicide that they may have seen * * *."

The court continued:

"[t]he suggestion that she somehow should have sent investigators to talk to random people on a corner without knowing who they are * * * with the hope that they might have been there at the time of this offense I think is asking a lot."

Accordingly, the court declined to "find any fault with [Lisco] for not going out on the street corner in the first place."

¶ 39     Additionally, the court further indicated that defendant's ineffective assistance claim also failed because Williams' testimony was so incredible that it would not have changed the outcome at trial. Referencing this Court's 2019 decision, the trial court noted that "the Appellate Court thought that it was essential that we vet Mr. Williams and have a hearing and listen to what he had to say and see if it would maybe make a difference." The court stated that it had done so and "listened carefully" to Williams, but found he was not credible:

"[T]he bottom line is I found Mr. Williams to be a wholly incredible witness. I didn't believe hardly anything that he said about anything. I cannot imagine that had he been available to Ms. Lisco, I'm not sure she would have called him as a matter of trial strategy because

he's so incredible that I'm not sure she would have called him at all as a witness because he was that bad. And even if she had, I cannot imagine it would make a difference in this case."

In further discussing Williams' testimony, the court found it was not "logical" to suggest that Riley, one of the shooting victims, used the shooting to "seize an opportunity * * * to make false claims about somebody that wasn't there so the police arrest the wrong person to settle some other score and let the person that really did this go." The court reiterated: "Would Mr. Williams' participation at the original trial have made a difference? I don't believe it would have at all."

¶ 40 The trial court went on to make clear that it was looking at the case through a "double lens" of both ineffective assistance and actual innocence. After finding no merit to the ineffective assistance claim, it likewise found no merit to defendant's claim of actual innocence:

"And as to an actual innocence claim, again, I have two witnesses that identified him. The jury believed [them]. I have a statement from [defendant] acknowledging his presence there. The jury looked at all of its totality. Would Mr. Willams' participation at the trial, had he been known, changed it? I'm not seeing it."

Thus, the trial court denied defendant postconviction relief with respect to both ineffective assistance and actual innocence.

¶ 41 ANALYSIS

¶ 42 On appeal, defendant argues that the trial court erred in (1) denying relief on his claim of ineffective assistance of trial counsel based on Lisco's alleged failure to investigate and present Williams, and (2) denying his claim of actual innocence that was orally raised during the hearing. He urges that on either basis, he is entitled to a new trial. We disagree.

¶ 43        Under the Post-Conviction Hearing Act, defendants may challenge their convictions by raising constitutional violations. *People v. Domagala*, 2013 IL 113688, ¶ 32. The Act sets forth three stages of review. At the first stage, a petition may be summarily dismissed as frivolous or patently without merit if it has no arguable basis. *Id*. At the second stage, counsel may be appointed and the State may file a motion to dismiss. *Id*. ¶ 33. In this stage, the circuit court determines whether the petition and supporting documentation make a substantial showing of a constitutional violation. *Id.* If the petitioner makes that showing, he is entitled to a third stage evidentiary hearing. *Id*. ¶ 34.

¶ 44        At a third stage hearing, "the circuit court must determine whether the evidence introduced demonstrates that the petitioner is, in fact, entitled to relief." *Id.* The trial court acts as the finder of fact at the evidentiary hearing, meaning "it is the court's function to determine witness credibility, decide the weight to be given testimony and evidence, and resolve any evidentiary conflicts." *Id*. "When a petition is advanced to a third-stage, evidentiary hearing, where fact-finding and credibility determinations are involved, we will not reverse a circuit court's decision unless it is manifestly erroneous." *People v. Pendleton*, 223 Ill. 2d 458, 473 (2006); accord *People v. Coleman*, 2013 IL 113307, ¶ 98 (in this procedural context, "we review the trial court's decision to deny relief following an evidentiary hearing [at the third stage] for manifest error"). "Manifest error is 'clearly evident, plain, and indisputable.' " *Coleman*, 2013 IL 113307, ¶ 98 (quoting *People v. Morgan*, 212 Ill. 2d 148, 155) (2004)). A decision is manifestly erroneous only when the opposite conclusion is clearly evident. *Id.*

¶ 45        With this standard in mind, we first turn to address the trial court's denial of defendant's ineffective assistance claim. "A defendant alleging a claim of ineffective assistance of counsel must satisfy both prongs of the test discussed in *Strickland v. Washington* * * *, which requires a

showing that 'counsel's performance was deficient' and the deficient performance 'prejudiced the defense.' " *People v. Williams,* 2017 IL App (1st) 152021, ¶ 36 (quoting *Strickland*, 466 U.S. 668, 687 (1984)). The first prong requires the defendant to show that " 'counsel's representation fell below an objective standard of reasonableness.' " *Williams,* 2017 IL App (1st) 152021, ¶ 36 (quoting *Strickland*, 466 U.S. at 688). The second prong requires the defendant to show "a 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " *Williams,* 2017 IL App (1st) 152021, ¶ 36 (quoting *Strickland*, 466 U.S. at 694). " 'A reasonable probability is a probability sufficient to undermine confidence in the outcome.' " *Williams,* 2017 IL App (1st) 152021, ¶ 36 (quoting *Strickland*, 466 U.S. at 694). If the defendant fails to meet either prong of the *Strickland* test, his claim must fail. *People v. Perry,* 224 Ill. 2d 312, 342 (2007). "Thus, a reviewing court need not consider whether counsel's performance was deficient before determining whether the defendant was so prejudiced by the alleged deficiencies that he is entitled to a new trial." *Perry,* 224 Ill. 2d at 342. This is because, "[i]f an ineffectiveness claim can be disposed of on the ground of insufficient prejudice, then that course should be taken, and the court does not need to consider the quality of the attorney's performance." *Williams*, 2017 IL App (1st) 152021, ¶ 36 (citing *Strickland*, 466 U.S. at 697).

¶ 46    In the present case, we need not address whether Lisco's alleged failure to investigate and find Williams, in particular, amounted to deficient representation. This is because, regardless of any issue that may be raised in that vein, the trial court found no resulting prejudice to support the second *Strickland* prong and we cannot say that finding comprised manifest error. See, *e.g.*, *Williams*, 2017 IL App (1st) 152021, ¶ 36 (if ineffectiveness claim can be disposed of on ground of insufficient prejudice, we need not consider counsel's deficiency).

¶ 47    Therefore, even were we to assume, *arguendo*, that Lisco rendered deficient performance in failing to seek out potential witnesses from the crime scene before trial (which we do not), we cannot say her failure to investigate Williams resulted in prejudice to defendant. There are two distinct reasons for this. First, the evidence at the hearing did not show that Williams, even had he been located by Lisco, would have been willing to testify at defendant's 2000 trial. Second, the trial court found that Williams' testimony was so incredible it would not have made a difference in the outcome of defendant's trial.

¶ 48    Defendant argues that "the record is clear that Williams would have been found had counsel looked" in the area of 67th Street and Blackstone before trial. Defendant points out that, at the evidentiary hearing, Williams testified he and his friends hung out near the site of the shooting "every day." However, even assuming that Williams could have been *identified* before defendant's trial (which we are hard-pressed to conceive, since defendant never mentioned him), Williams did not state that he would have been willing to testify in defendant's case. To the contrary, the record belies even the mere inference of this. Williams himself testified that he was not "friendly" with defendant as of 1998, as they were members of different gang factions which were "at war." Additionally, when asked when that war came to an end, Williams answered, "[p]robably 2001," that is, *after* defendant's 2000 trial.

¶ 49    Moreover, although Williams stated he agreed to testify for defendant after he "changed [his] life and became a God fearing man," he did not indicate that he would have agreed to testify for defendant in 2000, even had he been asked to do so by defendant's counsel. There is no indication he would have offered to give exculpatory testimony at defendant's trial, especially given his hearing testimony that he was a member of a rival gang at the time. This is particularly true when considering William's account that he did not talk to police after the shooting—a

17

shooting where his very best friend (Riley) was injured—because he did not trust them. Clearly, William's very own testimony casts doubt on any suggestion now made by defendant that Williams would have agreed to testify at his trial. Simply put, then, defendant cannot show prejudice because Williams did not indicate he would have testified at defendant's trial.

¶ 50   Additionally, the trial court's assessment of Williams' testimony is also critical here. That is, even assuming defendant had demonstrated that Williams was willing to testify in his defense in 2000 (which he did not), the trial court unequivocally found that Williams was incredible, and specifically, that he was so incredible that his testimony would not have made a difference in defendant's trial. As this finding was not manifestly erroneous, this precludes defendant from establishing prejudice to support his claim of ineffective assistance.

¶ 51   We emphasize that unlike a second-stage proceeding, at a third-stage hearing, we do not take the allegations and contents of supporting affidavits as true. See *People v. Velasco*, 2018 IL App (1st) 161683, ¶ 118 ("if a petition advances to a third-stage evidentiary hearing, a defendant will 'no longer enjoy[] the presumption that the allegations in his petition and accompanying affidavits are true" (quoting *People v. Gacho*, 2016 IL App (1st) 133492, ¶ 13)). Rather, at a third-stage hearing, the "trial court acts as a factfinder, making credibility determinations and weighing the evidence." *People v. Reed*, 2020 IL 124940, ¶ 51 (citing *People v. English*, 2013 IL 112890, ¶ 23); accord *Velasco*, 2018 IL App (1st) 161683, ¶ 118. "After an evidentiary hearing where fact-finding and credibility determinations are involved, the circuit court's decision will not be reversed unless it is manifestly erroneous." *English*, 2013 IL 112890, ¶ 23 (citing *People v. Beaman*, 229 Ill. 2d 56, 72 (2008)); accord *Reed*, 2020 IL 124940, ¶ 51 (citing *Coleman*, 2013 IL 113307, ¶ 98).

¶ 52        Here, the court emphasized that, after "listening carefully" to Williams' testimony, it found him to be a "wholly incredible witness" and that even if he had testified, "I cannot imagine it would make a difference in this case." In explaining this conclusion, the court indicated it found Williams' testimony was completely illogical, especially in its suggestion that Riley, one of the shooting victims, would use the shooting—during which he had been shot in the back and which required him to be hospitalized—as an opportunity to falsely identify defendant as a shooter so that the police would arrest him, all just to settle a score and let the true shooter get away. On the record before us, we cannot say the trial court's finding was manifestly erroneous. *Coleman*, 2013 IL 113307, ¶ 98.

¶ 53        Defendant emphasizes that Williams' testimony directly contradicted Riley and Wright's identification of defendant at trial. Nevertheless, the trial judge, as factfinder, was certainly entitled to find that Williams was wholly incredible and that his testimony would not have impacted the result at trial. Our supreme court instructs us to give deference to the trial court's credibility findings at this stage: "[T]he post-conviction trial judge is able to observe and hear the witnesses at the evidentiary hearing and, therefore, occupies a 'position of advantage in a search for the truth,' which 'is infinitely superior to that of a tribunal where the sole guide is the printed record." *People v. Coleman*, 183 Ill. 2d 366, 384 (1998) (quoting *Johnson v. Fulkerson*, 12 Ill. 2d 69, 75 (1957)); see also *People v. Fair*, 2024 IL 128373, ¶ 97 ("We reaffirm the long-standing principle that the finder of fact is generally the best judge of credibility and such determinations will not be overturned on appeal absent manifest error"). The trial court was in the best position to evaluate Williams' credibility here, upon observing his demeanor. See *Reed,* 2020 IL 124940, ¶ 54 (affirming denial of petition after the trial court found witness incredible at third-stage evidentiary hearing where "[w]e cannot say it was unreasonable to question the truthfulness" of

witness who "came forward only after being imprisoned and discussing the case with defendant").

¶ 54    Based on all this, then, we do not find that the trial court committed manifest error in concluding that Williams was incredible and that his testimony would not have made a difference in defendant's trial. Therefore, defendant did not demonstrate the requisite prejudice to sustain his claim of ineffective assistance of counsel. Accordingly, relief on that claim was properly denied.

¶ 55    Having concluded our discussion of defendant's ineffective assistance of counsel claim, we now turn to his second contention in this appeal, namely, that the trial court erred in denying him relief on his claim of actual innocence premised on Williams's testimony.

¶ 56    Before we address the merits, we note the unusual procedural posture of this claim and address the State's related arguments that the claim was "abandoned" or, alternatively, that it otherwise cannot be considered because it is not a "freestanding" claim of actual innocence. For the sake of a complete record here, we forgo the State's suggestion that either of its procedural arguments bars us from considering the actual innocence claim.

¶ 57    First, with respect to the State's "abandonment" argument, we recognize that defendant did not argue actual innocence in his prior appeal that resulted in our 2019 opinion remanding the matter for a third-stage evidentiary hearing. See *Johnso*n, 2019 IL App (1st) 153204, ¶ 30 ("We note that defendant alleged a claim of actual innocence in his amended successive postconviction petition, but he does not argue this issue on appeal"). That is, our prior opinion and remand for evidentiary hearing was premised on defendant's claim of ineffective assistance of trial counsel.

¶ 58        Then, on remand, it was not until after all witness testimony was complete and shortly before closing arguments began that defense counsel "s[ought] to clarify that there is both an ineffective assistance of counsel claim and an actual innocence claim that derives from" the same testimony. Nevertheless, and in spite of what could otherwise be considered wholly inappropriate procedural timing, the trial court agreed to consider the actual innocence claim, having reached the conclusion that it was based on the same evidence and, thus, the State would not be "prejudiced." The court also recognized that judicial economy favored considering both claims simultaneously, as it did not "want to be back here hearing the exact same evidence again simply because it is phrased on a different claim later. That would be a disaster for everyone to have to do that."

¶ 59        The trial court's remarks are well-taken. The State's argument that defendant was barred from raising an "abandoned" actual innocence claim essentially amounts to a claim of forfeiture. However, it is well settled that forfeiture is a limitation on the parties but not the courts, and we may overlook forfeiture to obtain a just result. *People v. Holmes*, 2016 IL App (1st) 132357, ¶ 65.  Our interest in a just result should be heightened where a defendant asserts actual innocence. Moreover, the State has not identified any way in which it was prejudiced by the trial court's decision to also consider defendant's actual innocence claim along with the ineffective assistance claim. As a matter of judicial economy, it is far better for the trial court (as it is, in turn, for our Court) to assess both claims in the same proceeding. As the trial court recognized, it would benefit no one to compel defendant to file yet another petition to assert an actual innocence claim based on the same evidence. Thus, we decline the State's invitation to avoid addressing defendant's actual innocence claim on the ground that it was "abandoned."

¶ 60        As a second procedural hurdle, the State argues that defendant's actual innocence claim fails because it is not "freestanding," pursuant to *People v. Hobley*, 182 Ill. 2d 404 (1998). *Hobley* recognized the viability of a "free-standing" claim of actual innocence in post-conviction review, explaining that a "free-standing" claim of innocence "means that the newly discovered evidence being relied upon 'is not being used to supplement an assertion of a constitutional violation with respect to [the] trial.' " *Id*. at 443-44 (quoting *People v. Washington*, 171 Ill. 2d 475, 479 (1996)). In *Hobley*, our supreme court determined that a defendant had not properly raised a claim of actual innocence where the claim relied on the same evidence he also used to support a separately-claimed constitutional violation. See *Hobley*, 182 Ill. 2d at 444 (wherein evidence of fingerprint report and second gas can was used both to argue due-process trial violation and claim of actual innocence).

¶ 61        In its brief on appeal, the State pointed out that certain decisions of our court have interpreted *Hobley* to mean that we cannot consider an actual innocence claim that relies on the same evidence used to support another claim of a constitutional violation. However, as defendant pointed out in his brief, our Court's much more recent decision in *People v. Martinez*, 2021 IL App (1st) 190490, declined to find that *Hobley* mandates preclusion of an actual innocence claim on this basis. See *Martinez*, 2021 IL App (1st) 190490, ¶¶ 102-04 (declaring "*Hobley* identified no principle or purpose that would be furthered by prohibiting a defendant from using the same evidence to assert both a constitutional claim of trial error and an actual innocence claim," and that such a rule "would potentially force a defendant to choose to forgo a meritorious claim of trial error in order to pursue an actual innocence claim").

¶ 62        Of particular significance, we would further note that, following oral argument in the instant case, our supreme court issued *People v. Flournoy*, 2024 IL 129353. *Flournoy* clarified

that a defendant can rely on the same evidence to *plead* both a claim of trial error and a claim of actual innocence but, since a claim of trial error relies on pre-existing evidence whereas a claim of actual innocence requires "newly discovered" evidence, the same evidence cannot *establish* both types of claims. *Flournoy*, 2024 IL 129353, ¶ 68. Pursuant to *Flournoy*, then, technically, there is no barrier to a defendant pleading a claim of actual innocence using the same evidence cited in support of a claim of trial error.[6] Thus, we reject the State's contention that defendant's ineffective assistance claim barred him from asserting an actual innocence claim using the same evidence.

¶ 63          Having overcome both procedural hurdles proposed by the State, we now turn to the merits of defendant's actual innocence claim. And, as we demonstrate below, based on the record before us, we hold that the trial court did not commit manifest error in denying defendant's actual innocence claim.

¶ 64          "To establish a claim of actual innocence, the supporting evidence must be (1) newly discovered, (2) material and not cumulative, and (3) of such conclusive character that it would probably change the result on retrial. [Citations.]" *People v. Robinson*, 2020 IL 123849, ¶ 47. "Newly discovered evidence" means evidence discovered after trial that defendant "could not have discovered earlier through the exercise of due diligence." *Id*. Evidence is material if it is relevant and probative of innocence, and it is noncumulative if it "adds to the information that the fact finder heard at trial." *Id*. Finally, the conclusive character element is the "most important element" of an actual innocence claim. *Id*. The "conclusive character element refers to evidence that, when considered along with the trial evidence, would probably lead to a different result."

---

[6] Insofar as *Flournoy* holds that evidence that establishes a claim of constitutional trial error cannot be "new" evidence that establishes a free-standing claim of actual innocence (*id*. ¶ 73), that poses no bar to defendant's actual innocence claim here because we have already determined that his claim of trial error lacks merit.

*Id.* ¶ 48. However, such new evidence "need not be entirely dispositive to be likely to alter the result on retrial." *Id.* "Probability, rather than certainty, is the key" in considering whether the fact finder would reach a different result. *Id.* "Ultimately, the question is whether the evidence * * * places the trial evidence in a different light and undermines the court's confidence in the judgment of guilt." *Id.*

¶ 65    At the evidentiary hearing stage of an actual innocence claim, the trial court will review the evidence presented in, first, determining whether it was new, material, and noncumulative. *Coleman,* 2013 IL 113307, ¶ 97. If it finds that any of it was, the court must then consider whether that evidence puts the evidence that was presented at trial in a different light, *i.e.*, so as to "undercut[ ] the court's confidence in the factual correctness of the guilty verdict." *Id.* This approach inherently involves credibility determinations that are precisely for trial judges to make. *Id.* Therefore, a highly deferential standard of review applies and, following an evidentiary hearing, the trial court's decision to deny relief on an actual innocence claim is reviewed for "manifest error," which as we have already discussed in detail, occurs only when the opposite conclusion is clearly evident. *Id*. ¶ 98 (citing *Morgan*, 212 Ill. 2d at 155).

¶ 66    Here, defendant suggests that the trial court's decision was manifestly erroneous because Williams' testimony was new evidence that would likely change the result on retrial, *i.e.*, that it would put the old trial evidence in a different light. In response, the State argues that we should affirm denial of the actual innocence claim because (1) Williams' testimony was not "newly discovered" and (2) Williams' testimony did not meet the "conclusive character" element. Noting the deferential standard of review, the State posits that defendant "cannot show that the trial court finding that Williams was incredible, and that his testimony would not have changed the result on retrial, was against the manifest with of the evidence." We ultimately agree with the

State for, despite defendant's insistence, we cannot say the trial court's finding was manifest error.

¶ 67 Initially, we note that in its oral ruling, the trial court did not make an explicit finding as to whether defendant met the element of showing "newly discovered" evidence, the first element noted above. That is, the trial court did not specifically state whether Williams' testimony constituted evidence discovered after trial that he "could not have discovered earlier through the exercise of due diligence." *Robinson*, 2020 IL 123849, ¶ 47. On this point, the State contends that Williams' testimony cannot be "newly discovered," given defendant's contention (in support of his ineffective assistance claim) that his trial counsel could have found Williams if she sent an investigator to the area of the shooting. We disagree with the State on that point. As we discussed with respect to the lack of prejudice, there was nothing to suggest that Williams, even if he was located by defendant's trial counsel, would have agreed to give exculpatory testimony in favor of defendant until several years later. Rather, defendant and Williams' testimony indicated that it was not until 2013 (according to Williams) or 2014 (according to defendant) that they discussed the shooting and Williams first indicated that he could be willing to provide an affidavit.

¶ 68 However, in any event, and regardless of whether the court found the "newly discovered" element was satisfied, the trial court clearly determined that defendant did not meet the "conclusive character" element—"the most important element" of an actual innocence claim. *Robinson*, 2020 IL 123849, ¶ 47. The trial court (who also presided over the original trial) determined that Williams was so incredible that his testimony would not have affected the outcome at trial, given the other evidence. On that basis, it denied the actual innocence claim.

¶ 69        Plainly, defendant's actual innocence claim depended on the court's assessment of the impact of Williams' exculpatory testimony, viewed in light of the evidence from defendant's trial. The trial court made clear that it found Williams' testimony was incredible and would not have changed the trial outcome. Keeping in mind the deference afforded to the trial court in assessing credibility at evidentiary hearings, we cannot say the decision to deny relief was manifest error. That is, we cannot say that the opposite conclusion was clearly evident.

¶ 70        We reiterate that whereas allegations are taken as true in the first two stages of postconviction proceedings, "[c]redibility findings and determinations as to the reliability of the supporting evidence are to be made only at a third-stage evidentiary hearing in a successive postconviction proceeding." *Robinson*, 2020 IL 123849, ¶ 61. Here, the trial court was tasked with assessing the credibility of Williams' testimony and deciding whether that testimony "place[d] the evidence presented at trial in a different light and undercuts the court's confidence in the factual correctness of the guilty verdict." *Coleman*, 2013 IL 113307, ¶ 97. The trial court clearly did not think that it did.

¶ 71        As discussed with respect to the prejudice prong of defendant's ineffective assistance claim, we must recognize that the trial court was uniquely positioned to observe and evaluate Williams' testimony and demeanor. The trial court found that Williams was so incredible that his testimony was unlikely to change the result at retrial, given the State's evidence that Riley and Wright identified defendant as the shooter and that defendant made an inculpatory statement to police in which he admitted to participating in the shooting. Giving due deference to the trial court's position as factfinder at the evidentiary hearing, we cannot say that finding was manifestly erroneous. Therefore, we will not reverse the trial court's denial of defendant's actual innocence claim.

¶ 72                                    CONCLUSION

¶ 73        Accordingly, for all the reasons stated herein, we affirm the judgment of the trial court

denying defendant third-stage postconviction relief on both his claim of ineffective assistance of

trial counsel and his claim of actual innocence.

¶ 74        Affirmed.

¶ 75        JUSTICE PUCINSKI, dissenting:

¶ 76        First, I must explain why I am even doing this: I continue my long-held belief that

juveniles do not have the mental capacity to knowingly, freely and voluntarily waive their most

fundamental constitutional rights to remain silent and be represented by counsel at all stages of

interrogation. The record here indicates that the State relied heavily on a highly questionable,

unrecorded, purported statement from the defendant when he was only 16 years old. In my view,

the circumstances and inconsistencies in that purported statement are significant in assessing the

strength of the defendant's postconviction claim for relief.

¶ 77                                    Background

¶ 78        The defendant's oral statement to police in this case, was never written, not signed and

not corrected by defendant, but was instead testified about by ASA D'Souza.

¶ 79        In 1998, defendant was 16.  In 1999, at the time of the trial, he was 17.  He testified at

the third-stage hearing on his successive postconviction petition that he was pressured by the

police to say what they told him, that they kept re-reading him a story, and that he was

frightened.

¶ 80        When he was arrested the police told his grandmother, who was standing nearby, that her

grandson was being arrested for murder. However, neither the police nor the ASA testified that

they actually told the defendant himself that he would be charged with murder. Instead, they

used the amorphous term "serious crime" when telling him that he could be charged and could be sentenced as an adult. It is possible he thought he was being arrested on some gun charge. What if he had actually heard the word "murder?" Would that have made him more alert to his situation? We don't know because he never heard the word.

¶ 81        But his "waiver" is also troubling because, although there was testimony from the ASA that he was given his *Miranda* warnings, there was also testimony that a written *Miranda* waiver form, although available in Area 2, was not given to defendant. He therefore did not read it and clearly did not sign it. The ASA testified that she read him the *Miranda* warnings from her FOB book and gave him his juvenile warning, which according to her testimony was that he could be charged and sentenced as an adult. At no time did the ASA attempt to explain the *Miranda* warnings in any language or words that would be more easily understood by a 16-year-old with a 6th grade education. Did he, for example, really know what it means to "waive" something? Did he really know what his right to be silent meant? There was no evaluation of his IQ or understanding of the process in the record.

¶ 82        Anyone who has ever known or raised a 16-year-old boy must acknowledge that very few are fully capable of understanding the full ramifications of giving up their most fundamental Constitutional rights.

¶ 83        In 1998, 1999, and 2003 we were ok with a 16-year-old giving up a foundational right to chance his liberty interest without the benefit of legal advice. What advice did this defendant get? None. No adult member of his family was with him. He was in an interview room at Area 2 alone for almost 8 hours. During that time his grandmother was not told he had been moved from police District 3 to Area 2, which are in different buildings. Although the grandmother testified that she could not go with defendant when he was arrested because she was caring for

two other grandchildren, there is no testimony that in the ensuing 8 hours she could not have found someone else to be with defendant. She called her pastor and a friend, but was not aware of defendant's location. Could she have found an attorney to help him? We do not know because the question was not asked. We do know that the youth officer who was there to "protect [defendant's] rights" did not stop things or get him an attorney.

¶ 84 During the actual interview, the ASA introduced the detective and a youth officer to the defendant. The youth officer testified that he never spoke during the interview, never asked for time alone with the defendant, never suggested that defendant not say anything, never suggested that an attorney could be brought in to assist, and never stopped the questioning. The defense attorney said the youth officer was sitting there like a bump on a log. That is an insult to bumps on any log. The ASA testified she introduced the youth officer to the defendant as someone who could help make sure his rights were protected. It is abundantly clear from the testimony that the youth officer did no such thing. And yet, in 1998, 1999 and 2003 the police, the ASA, and this court seemed to think all of that as perfectly alright.

¶ 85 We cannot overlook the importance of defendant's custodial statement at trial. The State certainly did not overlook it. In its closing argument, his statement took up 7 out of 13 pages of transcript. In its rebuttal, his statement took up 4 out of 7 pages of transcript. Taken together, that is 42.5% of the State's closing argument devoted to pushing the statement front and center to the jury. What impact did it have? We cannot know. But we can see that if the State thought it was so important, the jury must have heard that too. What if use of that statement had been denied? The State would have been left with unrelated eyewitnesses who did not identify the defendant and two victims from a rival gang whose testimony was inconsistent. Larrail Wright said he looked up and saw three men shooting, Big Mac (defendant) and Pumpkin (co-defendant

29

Branch) on one side of the street and Quick on the other; Mahdi Riley said he looked over and saw Big Mac and Pumpkin, but did not mention Quick; and the testimony of a police detective contradicted the testimony of Wright. There was no physical evidence tying the defendant to this crime. In fact, the physical evidence contradicted defendant's statement about the kind of gun he had.

¶ 86    The jury heard this conflicting evidence and heard 42% of the State's closing argument focused on the defendant's statement. The State pounded on that statement because without it, this case was full of contradictions.

¶ 87    It is also apparent that the trial court relied heavily on the defendant's statement in denying relief after the third-stage evidentiary hearing that preceded the instant appeal.

¶ 88                                   2003 Appellate Decision

¶ 89    In defendant's direct appeal, this court found no error in denial of defendant's motion to suppress his statement. *People v. Johnson*, No. 1-00-3913 (2003) (unpublished order under Illinois Supreme Court Rule 23); PLA denied, 207 Ill. 2d 618 (January 28, 2004). In doing so, this court found that under the totality of the circumstances his statement was given voluntarily. *Id.* at 17. The decision that defendant's oral statement to ASA D'Souza was voluntary, when he was a 16-year-old suspect in the original trial, was wrong then and in my opinion is still wrong today. As that decision affirmed the denial of defendant's motion to suppress his statement and found his statement voluntary, defendant cannot argue the point because the issue has already been decided. See *People v. Williams*, 17 Ill. App. 3d 285, 292 (1974) (the doctrine of collateral estoppel, which bars relitigation of a decided question, applies to criminal as well as civil proceedings).

¶ 90     In a subsequent *pro se* Amended Successive Postconviction Petition, defendant raised the issue of his statement again, but that filing was superseded by an Amended Successive Postconviction Petition filed by his postconviction counsel in which the statement was not raised and which focused on ineffective assistance of counsel for failure to investigate witnesses.

¶ 91     Our colleagues in 2003 did not have the benefit of more than 20 years of new research into adolescent brain development, or the shift in the legislature on juvenile defendants. As detailed below, that research and legislation reflect an increasing understanding that juveniles are vulnerable to coerced confessions while in police custody. They also lack the maturity and understanding to make an intelligent decision as to whether to waive the constitutional right to remain silent.

¶ 92                                    Research

¶ 93     Studies consistently show that juveniles are more likely than adults to falsely confess. See Steven Drizin & Richard Leo, *The Problem of False Confessions in the Post-DNA World*, 82 N.C. L. Rev. 891, 944 (2004) (finding that, in a sample of 125 people who had falsely confessed to crimes, juveniles under 18 years old were an overrepresented group comprising approximately 33% of the sample). https://scholarship.law.unc.edu.nclr.vol.82. Professors Drizin and Leo noted that "one of the most common reasons cited by teenage false confessors is the belief that by confessing they would be able to go home." *Id*. at 969. More troubling was their finding that "more than four-fifths (81%) of the innocent defendants who chose to take their case to trial were wrongfully convicted 'beyond a reasonable doubt' even though their confession was ultimately demonstrated to be false." *Id.* at 996. "This study [demonstrates] the power of confession evidence to substantially prejudice a trier of fact's ability to even-handedly evaluate a criminal

31

defendant's culpability. *** [C]riminal officials and jurors often place almost blind faith in the evidentiary value of confession evidence." *Id.* at 995-96.

¶ 94     Research also indicates that juveniles may not understand the protections of the Constitution.

¶ 95     As early as 1980, Thomas Grisso identified that there is a question whether juvenile suspects have the capacity—both legal and psychological—to understand their *Miranda* rights. Thomas Grisso, *Juveniles' Capacities to Waive Miranda Rights: An Empirical Analysis*, 68 Calif. L. Rev. 1134 (1980); available at https://www.jstor.org/stable/3480263. His empirical study demonstrated that:

> "focusing on the right to silence *** more juveniles (61.8%) than adults (21.7%) failed to recognize that a judge cannot penalize someone for invoking his right to silence. Equally important, although most juveniles understood the warning of the right to remain silent, the majority (55.3%) believed that they would have to explain their criminal involvement in court if questioned by a judge." *Id*. at 1158-59.

¶ 96     In 2014, the American Psychological Association published a study that indicated "Black boys can be seen as responsible for their actions at an age when white boys still benefit from the assumption that children are essentially innocent." American Psychological Association, "Black Boys Viewed as Older, Less Innocent Than Whites, Research Finds"; available at https://apa.org/news/press/releases/2014/03.[7] "Black boys as young as 10 may not be viewed in

---

[7] The citation for the actual research article is: Phillip Atiba Goff, Matthew Christian Jackson, Brooke Allison Lewis Di Leone, Carmen Marie Culotta, and Natalies Ann DiTomasso, *The Essence of Innocence: Consequences of Dehumanizing Black Children*, 106 Journal of Personality and Social

the same light of childhood innocence as their white peers, but are instead more likely to be mistaken as older." *Id.* One of the researchers noted that the " 'average age overestimation for black boys exceed[ed] four and a half years' " meaning that " 'in some cases, black children may be viewed as adults when they are just 13 years old.' " *Id.* (quoting researcher Matthew Jackson, PhD).

¶ 97        A June 2016, article published by the American Bar Association pointed out some of the problems with juvenile interrogations and waiver. See Lorelei Laird, "Police Routinely Read Juveniles their *Miranda* Rights, But Do Kids Really Understand Them?"; available at https://www.americanbar.org/groups/public_interest/child_law/resources/child_law_practiceonline/child_law_practice/vol-35/august-2016/police-routinely-read-juveniles-their-miranda-rights--but-do-kid/. That article quoted one juvenile who said he spoke to police because "They just kept asking me questions, even after they told me that I could stay silent. So I just kept answering their questions." *Id.*

¶ 98        The ABA article explained that juveniles waive their *Miranda* rights at "extremely high rates" with "several studies putting it at roughly 90 percent." *Id*. Practicing criminal defense lawyers reported that their juvenile clients often do not understand their rights. Many think "that to 'waive' a right has something to do with waving a hand." *Id*. Children also frequently believe that the "right to remain silent" "means they shouldn't speak except to answer questions." *Id*.

¶ 99        In their 2021 paper, Kristin Henning and Rebba Omer argued that all youth should have counsel during custodial interrogations: "The characteristics that define the developmental state of adolescence render youth more vulnerable to the coercive and confusing nature of a custodial

---

Psychology 526 (2014). The article is available online at https://www.apa.org/pubs/journals/releases/psp-a0035663.pdf

interrogation. Teenagers are more impulsive and emotional than adults. They place greater focus on short-term gains and often fail to appreciate long-term consequences." Kristin Henning & Rebba Omer, *Vulnerable and Valued: Protecting Youth from the Perils of Custodial Interrogation*, 52 Ariz. St. L.J., 883, 896 (2021); available at

https://arizonastatelawjournal.org/2021/01/13/ulnerable-and-valued-protecting-youth-from-the-perils-of-custodial-interrogation/

¶ 100        Henning and Omer explained that "the brain's emotion center, called the limbic system, becomes very active, very quickly during adolescence, before the cognitive control system can catch up. This causes the teenage brain to place great focus on the immediacy of emotions." *Id*. at 897. This raises the risk of adolescents being pressured into giving false confessions: "36% of all exonerated youth falsely confessed to the alleged crime." *Id*. at 918. "Sixty-seven percent of exonerated youth who falsely confessed were Black." *Id*. at 919.

¶ 101        Jay D. Aronson said: "all available evidence seems to suggest that many important regions of the brain continue to develop through adolescence and into adulthood." Jay D. Aronson, *Neuroscience and Juvenile Justice*, 42 Akron L. Rev. 917, 924 (2009); available at: https:// ideaexchange.uakron.edu/akronlawreview/vol42/iss3/8.

¶ 102        In her 2010 article, Alison D. Redlich said: "One of the primary risk factors to police-induced false confessions is youth." Allison D. Redlich, *The Susceptibility of Juveniles to False Confessions and False Guilty Pleas*, 62 Rutgers L. Rev. 943, 952 (2010); available at https://www.rutgerslawreview.com/wp-content/uploads/2011/08/The-Susceptibility-of-Juveniles-to-False-Confessions-and-False-Guilty-Pleas.pdf. Specific to false confessions, Redlich noted:

"a recent scientific consensus paper addressed three situational aspects of interrogations that are common to these statements: 1) physical custody and isolation; interrogations conducted in the absence of social support for protracted periods; 2) presentation of false evidence: lying to suspects about non-existent evidence against them; and 3) minimization: police-originated scenarios that serve to minimize the severity of the crime and/or the suspect's culpability making it easier to confess." *Id.*

Redlich continued: "Though research has established that juveniles misjudged to be guilty are at risk for falsely confessing in the context of police interrogations, the research has also suggested that it is the combination of dispositional factors (i.e. young age) and situational interrogation techniques, (i.e., overly long interrogations and inappropriate interrogation techniques) that serve to increase the risk." *Id.* at 956. She concludes: "In police-induced false confession cases, interrogators certain of the suspect's guilt refuse to accept denials; the interrogation continues until the suspect privately realizes that the only way out is to offer false admissions." *Id.*

¶ 103       According to one article, research indicates that "even *** youth who have a basic understanding of the words and phrases used in *Miranda* warnings still have difficulty appreciating the significance of the warnings and how their rights apply to interrogation contexts." Naomi E.S. Goldstein, Emily Haney-Caron, Marsha Levick & Danielle Whiteman, *Waving Good-Bye to Waiver: A Developmental Argument Against Youths' Waiver of Miranda Rights,* 21 NYU J. Legis. & Pub. Pol'y, 1, 31 (2018); available at https://nyujlpp.org/wp-content/uploads/2019/06/Legis-21-1-Article-Goldstein-WavingGoodbyetoWaiver.pdf. Indeed,

"approximately ninety-four percent of youth ages twelve to nineteen demonstrated less than adequate appreciation of the significance and consequences of waiving their rights." *Id.*

¶ 104    Research shows that approximately 90% of adolescents waive their *Miranda* rights.  See Barry C. Feld, *Behind Closed Doors: What Really Happens When Cops Question Kids,* 23 Cornell J.L & Pub. Pol'y, 395, 429 (2013).

¶ 105                    Legislation Limiting Minors' Decision-Making

¶ 106    Numerous statutory prohibitions and limitations support the common-sense proposition that most minors are ill-equipped to make major decisions that could impact their health, safety, or legal obligations.

¶ 107    For example, a person generally cannot obtain a Firearm Owner's Identification Card unless he or she has attained 21 years of age or has the written consent of a parent or legal guardian to possess a firearm. See 430 ILCS 65/4(a) (West 2022). The law prohibits the sale of tobacco products or alternative nicotine products to persons under 21 years of age (720 ILCS 675/1 (West 2022). Similarly, it is unlawful to "sell, give, or deliver" alcoholic beverages to persons under 21 years of age. 235 ILCS 5/6-16(a)(i) (West 2022).

¶ 108    Persons under 18 years of age cannot be legally married, with the exception of persons over 16 who have obtained the consent of parents, a guardian, or judicial approval. 750 ILCS 5/203(1) (West 2022).

¶ 109    The School Code generally requires school attendance for children between the ages of 6 and 17 years; children who have reached age 16 may leave school if they submit evidence of "necessary and lawful employment" and are enrolled in a graduation incentives program or an alternative learning opportunities program. 105 ILCS 5/26-1 (West 2022).

¶ 110    Subject to limited exceptions, minors under 16 years of age are prohibited from being "employed, permitted or allowed to work in any gainful occupation." 820 ILCS 205(1) (West 2022). The presumption that minors are *not* equipped to manage their own business and legal matters is also evidenced by the Emancipation of Minors Act. 750 ILCS 30/1 *et seq.* (West 2024). That statute allows a "mature minor" between the ages of 16 and 18 to "obtain the legal status of an emancipated person with power to enter into valid legal contracts" but only if he or she "has demonstrated the ability and capacity to manage the minor's own affairs and to live wholly or partially independent of the minor's parents or guardian." *Id.* §§ 2, 3-2.

¶ 111    Generally, "a minor who enters into a contract may disaffirm or ratify it upon reaching adulthood." *Villalobos v. Cicero School District 99,* 362 Ill. App. 3d 704 (2005) (citing *Dixon National Bank of Dixon v. Neal*, 5 Ill. 2d 328, 336 (1955)). The legislature has specified only certain circumstances in which a contract entered into by a minor may *not* be disaffirmed or rescinded on the basis of minority. See, *e.g.,* 820 ILCS 20/1(a) (West 2022) (a contract for "artistic or creative services that is entered into during minority and that is otherwise valid may not be disaffirmed upon that ground *** if the contract or agreement has been approved by the circuit court in the county in which the minor resides or is employed."); 215 ILCS 5/242 (West 2022) ("Any minor of the age of fifteen years or more may, notwithstanding such minority, contract for life, health and accident insurance on his own life for his own benefit or for the benefit of his father, mother, husband, wife, child, brother or sister, and may exercise all such contractual rights and powers ****. Such minor shall not, by reason of his minority, be entitled to rescind, avoid, or repudiate such contract, or any exercise of a right or privilege thereunder.").

¶ 112    Thus, while a 16-year-old can technically buy a car with cash, an auto loan is out of the question until the teenager is 18 years old. Minors can't register vehicles in their names or purchase car insurance by themselves.

¶ 113    So, we don't let them do any of those things but we do let them waive their *Miranda* rights?  What if it were your child? Would you think that was ok then?

¶ 114                    <u>Recent Juvenile Justice Legislation</u>

¶ 115    Since 2003, the legislature has passed several bills that change the dynamics of juvenile justice. For example, a person under the age of 21 at the time of the commission of first degree murder "who is sentenced on or after June 1, 2019 (the effective date of Public Act 100-1182) shall be eligible for parole review after serving 20 years or more" of his sentence.  730 ILCS 5/5-4.5-115(b) (West 2024). This legislation was effective June 1, 2019 and was not retroactive.

¶ 116    In addition, the exclusive jurisdiction provision of the Juvenile Court Act of 1987 (705 ILCS 5-120 (West 2022)) was amended through Public Act 98-61, section 5 (eff. Jan 1, 2014) to extend its application to minors under the age of 18, not 17 as was the case in the original bill. See *People v. Richardson*, 2015 IL 118255, ¶ 3.  This legislative amendment was not retroactive.

¶ 117    The legislature changed the age of juveniles who could be automatically transferred from juvenile court to adult court for certain crimes from age 15 to age 16 at the time of the commission of the crime.  705 ILCS 405/5-130(1)(a) (West 2024) (providing that the definition of a "delinquent minor" does not apply to a minor who at the time of the offense was at least 16 years old who is charged with one of the specified offenses). What stands out is that juvenile defendants whose cases were decided before these changes cannot readily get the advantage of developing research or new laws. I understand that whether a statute is retroactive is generally

the province of the legislature. However, these particular non-retroactive laws have effectively created two classes of juvenile defendants.

¶ 118    The Illinois legislature is currently considering legislation that would require all juvenile defendants to have legal representation during police custodial questioning, meaning after the arrest.  SB3321, 103rd General Assembly.  Sen. Robert Peters, Sen. Mattie Hunter.; available at https://www.ilga.gov/legislation/103/SB/10300SB3321.htm That legislation would provide that a minor may not waive the right to counsel during "custodial interrogation", and that a minor's statements during custodial interrogation are presumptively inadmissible. *Id.* That only solves part of the problem, since police also question juvenile suspects "before an arrest," for example at the scene of a crime, in the car during transport to the station, and at the station itself.  Courts are then left to consider when and where custodial interrogation begins. It would be easier for everyone if the legislature just defined juvenile custody as any questioning by the police of any juvenile, even if the police are still treating the juvenile as a witness.

¶ 119                                          Caselaw

¶ 120    United States Supreme Court precedent has consistently recognized that juveniles are more vulnerable than adults in the context of custodial interrogation. In *Haley v. Ohio*, 332 U.S. 596, 599 (1948), the Court noted that interrogation techniques that "would leave a man cold and unimpressed can overawe and overwhelm a lad in his early teens." The Court later "emphasized that admissions and confessions of juveniles require special caution." *In re Gault*, 387 U.S. 1, 45, (1967).  In 1979, the Court held that a trial court evaluating a motion to suppress must weigh the juvenile's "age, experience, education, background and intelligence, and *** whether he has the capacity to understand the warnings given to him, the nature of his Fifth Amendment rights and the consequences of waiving those rights."  *Fare v. Michael C.*, 442 U.S. 707, 725 (1979).  In

39

*Bellotti v. Beard*, 443 U.S. 622, 635 (1979), the Court noted that teenagers "often lack the experience, perspective and judgment to recognize and avoid choices that could be detrimental to them." In *Eddings v. Oklahoma*, 455 U.S. 104, 115 (1982), the Court recognized that "youth is far more than a chronological fact" and that "minors, especially in their earlier years, generally are less mature and responsible than adults." In *Roper v. Simmons*, 543 U.S. 551, 569 (2005), the Court stated that "juveniles are more vulnerable or susceptible to *** outside pressures" than adults. In *J.D.B. v. North Carolina,* 564 U.S. 261 (2011), the court applied *Miranda* to juvenile suspects, holding that there is a relevant difference between juveniles and adults in analyzing whether a reasonable person would consider himself in custody for *Miranda* purposes. The Court recognized that "children will often feel bound to submit to police questioning when an adult in the same circumstances would feel free to leave," leading it to hold that "a child's age properly informs the *Miranda* custody analysis." *Id.* at 264-65.

¶ 121          Illinois uses a "totality of the circumstances" analysis to decide if a juvenile's confession is voluntary or involuntary. *People v. Travis*, 2013 IL App (3d) 110170, ¶ 54 (citing *People v. Murdock*, 2012 IL 112362, ¶ 30). Courts look at factors such as whether the police used deception, the time of day and duration of the interrogation, the presence of an interested adult, the age of the juvenile, his experience, educational background, intelligence, capacity to understand *Miranda* warnings, understanding of the nature of Fifth Amendment rights, and the consequences of waiving those rights. See, e.g., *Murdock*, 2012 IL 112362, ¶¶ 44-55 (discussing various factors in finding juvenile confession was voluntary despite absence of concerned adult); *In re G.O.*, 191 Ill. 2d 37, 54-57 (2000) (discussing factors and determining juvenile confession was admissible as "the totality of the circumstances indicates that [his] confession was the result of his own decision and not the result of compulsion or his will being overborne.").

¶ 122     But in my opinion, the "totality of the circumstances" analysis has not caught up with the science when evaluating these factors and it should.

¶ 123                                        My Other Concerns

¶ 124     Apart from the State's heavy reliance on a possibly coerced statement from the 16-year-old defendant, there are other aspects of the case which lead me to disagree with the majority's opinion affirming the conclusions of the third-stage evidentiary hearing.

¶ 125     For one, the trial court took up the oral request of the defendant to decide on his actual innocence claim, even though it was clearly not in the mandate from this court. I would reverse on this basis alone. The trial court exceeded the mandate of our 2019 opinion, which specifically remanded for a third-stage evidentiary hearing only on defendant's ineffective assistance of counsel claim. The trial court had no authority to go beyond the mandate to hear, much less decide, the separate actual innocence claim. This has been the rule since at least 1918. "It is the duty of the circuit court to execute the mandate of this court, and where our directions are 'precise and unambiguous,' the circuit court may not look elsewhere for authority to change the mandate's meaning or direction." *People v. Brown*, 2022 IL 127201 (quoting *Fisher v. Burks*, 285 Ill. 290, 293 (1918)). "The trial court may only do those things directed in the mandate." *PSL Realty Co v. Granite Investment Co.,* 86 Ill. 2d 291, 308 (1981). The matter of actual innocence should have been subject to proper preparation and briefing; it should not have been a spur of the moment addition to the hearing. Because the trial court erred in considering the actual innocence claim, I would reverse the denial of relief premised on that claim. Defendant should be permitted to file a new successive postconviction petition that fully lays out such a claim.

¶ 126     There are a number of inconsistencies in the State's evidence.

¶ 127     First, Larrail Wright testified that he saw defendant and Branch (codefendant "Pumpkin") and a third man known as "Quick" shooting toward the crowd where he, Wright, was standing. Wright also testified that he told detective Binkowski that defendant, Branch and Quick were the shooters. Wright testified that he identified defendant "from the shooting" in a lineup. But detective Binkowski testified that Wright told him that defendant was not a shooter.

¶ 128     Mahdi Riley testified that he saw two shooters, Branch and Quick. Riley identified defendant as "from the shooting" but did not testify he saw defendant shoot. Mikki West testified that she did not see the shooters. So, there were two victims (Riley and Wright) who contradicted each other: were there two or three shooters?  Was Quick one of them? Was defendant?

¶ 129     Detective Przepiora testified that Wright identified defendant in a lineup as one of the shooters, and later identified Branch as one of the shooters.  No one identified Quick, in fact, we still do not even know for sure who he is, but we do know that the State did not bring him to trial for this shooting.

¶ 130     Second, the police forensic team testified that they found three groups of bullet casings at the corner where the shooters were standing:  two groups on one side of the street and one group on the other side.  That means that the casings indicate three shooters: so, again, what happened to Quick?

¶ 131     Third, the police forensic team testified that all of the bullet casings were from .9 mm guns and that is it impossible to fire .9 mm bullets from a .38 caliber gun. Thus, the physical evidence directly contradicts the defendant's purported statement to the ASA that he fired from a .38 caliber weapon.

¶ 132     Fourth, the defendant purportedly told the ASA that after he heard shots, he ran around through an alley and behind Branch and started shooting. But how is it possible that he heard the

shots and got there to start shooting, when the witnesses/victims of the shooting said that there were already two – or maybe three – shooters doing the shooting when they were wounded? Either the defendant got there AFTER the shooting started, or, his statement about running around through an alley makes no sense.

¶ 133     Fifth, defendant allegedly told the ASA that he came around through the alley behind Branch. But the witnesses/victims did not say anything about someone, anyone, joining Branch. They said that Branch and one other man—or was it two other men—started shooting. No witness said there was any delay while someone from the alley caught up and joined the action.

¶ 134     Sixth, the purported statement from the 16-year-old defendant to the ASA was not written out by defendant or the ASA, not read by defendant, not signed by defendant, and never entered into evidence.

¶ 135     Seventh, defendant has to date provided three affidavits from people who say they were there and did not see defendant shooting: Terrence Hilliard (now deceased), Jason Nichols and Douglas Williams.

¶ 136     Eighth, nowhere in the record does it appear that Jason Nichols was called to testify.

¶ 137     Turning to the testimony elicited at the third-stage evidentiary hearing, I also believe the record supports defendant's ineffective assistance of counsel claim based on his trial counsel's failure to investigate. Nowhere in the record does it appear that defendant's trial attorney, Lisco, actually made an effort to locate witnesses from the corner of 67th Street and Blackstone at a time that approximated the time of the crime. She did not deny that defendant had asked her to look for potential witnesses in that area. She admitted that she did not remember sending any investigator to look for witnesses. She did say that there are daytime photos of the scene that she believed her investigator would have taken, but taking daytime photos of the scene and going

43

there at about the same time as the crime are two entirely different things. No one, it appears, looked for any neutral witnesses, maybe someone who lived in the neighborhood, or was sitting on his porch, or was shopping in the store, or was cleaning up the church across the street, or was just hanging around on the other two corners.

¶ 138    In this respect, I take issue with the trial court's comments suggesting Lisco had no duty to undertake such investigation. The trial court stated: "I never heard of an investigation …where you go out days later and canvass a street corner." The trial court indicated its belief that it was "asking a lot" to think that a defense attorney would send someone out to investigate the scene of the crime without some specific building or person to look for. That is entirely inaccurate. Defense attorneys investigate crime scenes all the time with no specific information:  that is why it is an investigation…. to see what you can find out.

¶ 139    I also believe that Douglas Williams' hearing testimony was enough to show prejudice resulting from Lisco's failure to investigate.  Williams testified unequivocally that he saw Quick shooting and that two other men were shooting.  So, he saw three men shooting and testified that defendant was not one of the shooters. The trial court indicated it did not believe anything that Williams said, but it did not identify any contradictions in Williams' statement. The court just generally said that Williams was incredible. I also note that there is no indication that anyone checked Williams' record in prison.  Was he a model prisoner? Had he completed some courses? Was he a trouble-maker? The record does not answer these questions.

¶ 140                                    Conclusion

¶ 141    Anyone who seriously thinks that kids understand the significance of talking to the police without legal assistance is totally missing the point. Kids are kids. They are not small grown-ups.

They cannot be expected to knowingly give up a right that they probably do not even fully understand.

¶ 142　　　We should be able to find a way to apply current research and current laws to re-visit the earlier convictions of juvenile defendants. We have created a two-class juvenile justice system —those from before the research and laws, and those from after—which should be unacceptable in any advanced society.

¶ 143　　　 In summary, I would reverse the denial of relief with respect to the actual innocence claim (which was not properly before the trial court). I would also reverse the denial of relief with respect to the claim of ineffective assistance of trial counsel, and grant defendant a new trial on that basis. At the very least, defendant should be permitted to re-file his actual innocence claim in a successive petition.